UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
S.C. and H.R., individually and as parents and legal
guardians of M.R., a minor,

                              Plaintiffs,

                 - against -

MONROE WOODBURY CENTRAL SCHOOL
DISTRICT, MONROE WOODBURY CENTRAL
SCHOOL DISTRICT BOARD OF EDUCATION,
JOSEPH DILORENZO, individually and in his capacity
as prior superintendent of schools, EDWARD J.
MEHRHOF, individually and in his capacity as
superintendent of schools, MATTHEW KRAVATZ,
individually and in his capacity as principal of North
Main Street Elementary School, and UNKNOWN
AGENTS AND ASSIGNS OF MONROE
WOODBURY CENTRAL SCHOOL DISTRICT 1-100,

                           Defendants.
-------------------------------------------------------------------x

**<u>OPINION AND ORDER</u>**

11-CV-1672 (CS)

<u>Appearances</u>:
Giulia Frasca, Esq.
Law Office of Peter D. Hoffman
Katonah, New York
*Counsel for Plaintiffs*

Adam I. Kleinberg
Michael P. Siravo
Sokoloff Stern LLP
Westbury, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

      Before the Court is Defendants' motion to dismiss Plaintiffs' Amended Complaint.  (Doc.

11.)  For the reasons stated below, the motion is GRANTED.

I.      **Background**

    **A. Factual Background**

I assume the facts, but not the conclusions, in the Amended Complaint ("Am. Compl."),

(Doc. 8), to be true for purposes of Defendants' motion.  M.R., born on May 27, 2002, attended

North Main Street Elementary School ("North Main"), part of Defendant Monroe Woodbury

Central School District ("MWCSD"), from September 2007 until February 3, 2010.[1]  (*Id.* ¶ 7.)

Plaintiffs S.C. and H.R. are M.R.'s mother and father, respectively.  (*Id.*)  Defendant Joseph

DiLorenzo was the superintendent of MWCSD during the events giving rise to this lawsuit.  (*Id.*

¶ 10.)  Defendant Edward J. Mehrhof is the current superintendent of MWCSD.  (*Id.* ¶ 11.)

Defendant Matthew Kravatz is the principal of North Main.  (*Id.* ¶ 12.)

At a parent-teacher conference in early November 2009, S.C. told M.R.'s classroom

teacher Ms. Glick that another student, B.S., had been physically aggressive toward M.R. and

had been bullying M.R. on the playground on a regular basis since mid-October.  (*Id.* ¶ 15.)

M.R. had told S.C. about the bullying and aggressive behavior for the first time that day.  (*Id.*)

Within a week or two, M.R. told his parents that another student, V.A., had been hitting him a

lot.  (*Id.* ¶ 16.)  S.C. had a phone conversation about V.A.'s bullying with Ms. Glick and V.A.'s

mother, (*id.*), an MWCSD employee, (*id.* ¶ 34).  Shortly thereafter, S.C. repeatedly called Ms.

Glick about B.S.'s aggression towards and bullying of M.R.  (*Id.* ¶ 17.)

On December 10, 2009, because M.R. told S.C. that B.S.'s bullying had persisted, S.C.

sent an e-mail to Kravatz and Glick about B.S.'s treatment of M.R.  (*Id.* ¶ 18.)  Plaintiff also

called B.S.'s mother, an MWCSD employee, to discuss the situation, and found that no one from

North Main had informed her about B.S.'s behavior.  (*Id.* ¶ 18 & n.2.)  The next day, S.C. and

---

[1]    The Amended Complaint states that M.R. attended MWCSD, but I assume that Plaintiffs instead meant to state that M.R. attended North Main.

H.R. met with Kravatz about the bullying and aggression that M.R. was facing at school, which

Kravatz did not dispute. (*Id.* ¶ 19.) S.C. told Kravatz that M.R. had been complaining about

school for weeks, did not want to go to school, and hated school and recess. (*Id.* ¶ 20.) S.C. also

told Kravatz that the bullying made M.R. very unhappy at home and that M.R. had previously

loved school. (*Id.*) At this meeting, Kravatz said that he would stop B.S.'s bullying of M.R.

with a recess monitor. (*Id.* ¶ 21.)

On December 13, 2009, S.C. memorialized the December 11, 2009 meeting in two e-

mails to Kravatz that explained some possible remedial steps, but noted that the meeting had

"failed to result in conclusive action" to stop the bullying of and aggressive behavior towards

M.R. (*Id.* ¶ 24.) Plaintiffs have submitted those e-mails in opposition to Defendants' motion to

dismiss. (*See* Frasca Decl. Ex. 3.)[2] In the first, sent at 12:44 p.m., S.C. stated that she wished to

confirm the use of a 1:1 recess monitor for another student I assume to be B.S., voiced her

concerns about the availability of a monitor during staff shortages and indoor recesses, and asked

---

[2]      "Frasca Decl." refers to the Affirmation of Giulia Frasca, Esq. in opposition to Defendant's motion to
dismiss. (Doc. 16.) Defendants' counsel has submitted an affirmation as Exhibit 2 to her Declaration, in which she
affirms, under penalty of perjury, that she is "personally familiar with the facts and circumstances of this action,
based upon [her] personal knowledge and [her] review of the files and information maintained by [her] office."
(Frasca Decl. Ex. 2 ¶ 1.) But her affirmation – which I may not consider on a motion to dismiss in any event, *see*
*Friedl v. City of N.Y.*, 210 F.3d 79, 83-84 (2d Cir. 2000); *Hoy v. Inc. Vill. of Bayville*, 765 F. Supp. 2d 158, 164
(E.D.N.Y. 2011) – is full of facts of which she cannot possibly have personal knowledge and to which she cannot
possibly swear, *e.g.*, "Kravatz lied." (Frasca Decl. ¶ 8.) Defendants' counsel is cautioned to assert only facts of
which she has personal knowledge in future sworn statements. *Cf.* Fed. R. Civ. P. 56(c)(4) ("An affidavit or
declaration used to support or oppose a motion must be made on personal knowledge . . . .").

        As for the  December 13, 2009 e-mails, I may consider them, and others cited below, on the instant motion
because the Amended Complaint makes "clear, definite and substantial reference" to them, thus incorporating them
by reference. *Perez v. Metro. Transp. Auth.*, No. 11-CV-8655, 2012 WL 1943943, at *6 (S.D.N.Y. May 29, 2012)
(internal quotation marks omitted); *see also DeMasi v. Benefico*, 567 F. Supp. 2d 449, 453 (S.D.N.Y. 2008) ("Mere
discussion or limited quotation of a document in a complaint is insufficient" for incorporation by reference) (internal
quotation marks omitted). Moreover, such e-mails are integral to the Amended Complaint because Plaintiffs have
clearly relied on them in drafting the Amended Complaint, and thus I may consider them for this reason as well. *See*
*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002). These e-mails form the basis of Plaintiffs'
position that Defendants ignored Plaintiffs' multiple attempts to prod Defendants into improving the environment at
North Main for M.R. In any event, even if I may not consider these e-mails, my conclusions would not change.

whether the recess monitor would be used for the rest of the school year.  (*See id.*)  S.C. also noted that she had had a conversation with North Main social worker Sarah Petroccitto, (*see* Am. Compl. ¶ 32), and that Petroccitto "seemed [to] have a good grasp of the situation."  (Frasca Decl. Ex. 3.)  S.C. stated that "we've decided that [Petroccito will] work with [M.R.] temporarily on assertiveness and communication skills specific to the situation, and she'll get back to me about how it went and whether she has any additional recommendations."  (*Id.*)[3]  S.C. ended the e-mail with the following paragraph:

> I also wanted to let you know that [M.R.] told me he enjoyed talking with you Friday – he said it was private though, so he couldn't tell me what was said. Both my husband and I found him to be noticeably more relaxed and cheerful Friday afternoon.  So, again, thank you for your professional caring attention.

(*Id.*)

In the second e-mail, sent at 9:02 p.m. in reply to an e-mail Kravatz sent earlier that day, S.C. said that it was her understanding from the previous conversation with Kravatz that one outdoor recess monitor would be assigned only to B.S.; it was unclear what "a monitor assigned to some students" meant; and that she was not necessarily advocating for the use of a 1:1 monitor, but just wanted to be clear on what Kravatz's plans were, noting that his plans were different from the inadequate plans that had been in place up to that point.  (*Id.*)  S.C. noted that it was Kravatz's decision when the use of the outdoor monitor would be discontinued and that Kravatz had been receptive and helpful thus far.  (*Id.*)  According to Plaintiffs, Kravatz responded to S.C.'s e-mail, (Am. Compl. ¶ 25), but the Amended Complaint is silent as to the substance of his response.[4]

---

[3]    Plaintiffs allege that the counseling M.R. received is contraindicated by anti-bullying literature and experts. (Am. Compl. ¶ 26.)

[4]    A response from Kravatz appears to have been submitted with Plaintiffs' opposition, (*see* Frasca Decl. Ex. 5), but this response is undated, and it is not clear as to which of S.C.'s e-mails it responds.  Thus I do not consider it on the instant motion.

Notwithstanding the recess monitor, the bullying continued.  (*Id.* ¶ 22.)  Plaintiffs allege that Kravatz "routinely stated that the school could not prevent every bullying event, that monitoring Plaintiff MR would not prevent every bullying event and that, notwithstanding the best efforts of supervisors, children get injured and that not every student could be seen all the time."  (*Id.* ¶ 23.)[5]

On January 12, 2009, S.C. notified Kravatz that the bullying of and aggressive behavior toward M.R. was continuing.  (*Id.* ¶ 27.)  S.C. reported that during recess, M.R. had been pushed into the ice by another student.  (*Id.*)  The recess monitor acknowledged this incident and told both boys to be nice, but did nothing else to stop the bullying, nor did she report the incident. (*Id.*)  The conduct continued for the entire recess period.  (*Id.*)  S.C. also reported other instances of B.S.'s bullying of M.R., including but not limited to body slamming M.R. into a bookcase during an indoor recess and constant chasing of M.R. that left him feeling like he could not escape.  (*Id.*)  At this time, the bullying toward M.R. was escalating in severity and frequency. (*Id.*)

On January 13, 2010, S.C. spoke with Kravatz by telephone about B.S.'s continued bullying of M.R.  (*Id.* ¶ 28.)  Kravatz focused on M.R.'s assertiveness skills and suggested that M.R. join the Boy Scouts.  (*Id.*)  Plaintiff interpreted Kravatz as implying that M.R. was exaggerating and overreacting, and as blaming M.R. for being bullied.  (*Id.*)

On January 14, 2010, M.R. told S.C. that V.A. had choked him and that M.R. had reported this to Glick.  (*Id.* ¶ 29.)  According to M.R., Glick told M.R. that the two students should stay away from each other.  (*Id.*)  On or about January 16, 2010, S.C. informed V.A.'s mother that V.A. had choked M.R., but according to Plaintiffs, V.A.'s mother minimized V.A.'s

---

[5]      The Amended Complaint is unclear as to when Kravatz made these statements.

actions.  (*Id.* ¶ 30.)  On January 21, 2010, Assistant Principal of North Main Dolores Terlecky
called S.C. to tell her that M.R. had been hit and was seen crying.  (*Id.* ¶ 31.)  During this
incident, V.A. held M.R. down by his wrists, placed above his head, and recruited another
student, M.C., to hold down M.R.'s feet.  (*Id.* ¶ 31.)

On January 25, 2010, H.R. and S.C. met with Kravatz, Terlecky, Petroccitto, and Glick
concerning the bullying of M.R.  (*Id.* ¶ 32.)  At this meeting, S.C. mentioned the choking
incident, of which Glick "acted completely unaware."  (*Id.* ¶ 33.)  The North Main personnel at
the meeting focused on M.R.'s assertiveness and communication skills, which M.R.'s parents
again interpreted as placing blame on M.R. and insinuating that M.R. was overly sensitive and
exaggerating.  (*Id.*)  H.R. and S.C. said that M.R.'s assertiveness skills were not the problem and
began asking questions about what was being done to prevent the bullying.  (*Id.*)  During this
meeting, the parties agreed on several measures designed to stop the bullying, including keeping
M.R., V.A., and M.C. separated at all times.  (*Id.*)  After the January 25 meeting, S.C. spoke to
V.A.'s mother, who "agreed that the classroom was in chaos" and had stated on other occasions
that the classroom lacked order and control.  (*Id.* ¶ 34.)

On January 26, 2010, S.C. sent Kravatz an e-mail memorializing the January 25 meeting.
(*Id.* ¶ 35.)  In the e-mail, she questioned the safety of M.R. and all students in MWCSD,
described instances of other children being bullied, and noted the lack of a policy, practice,
training, education, and professional development directed at preventing bullying.  (*Id.*)  This e-
mail suggested possible solutions, including reminding each class that bullying would not be
tolerated and would be met with "swift and unpleasant consequences," and sending home a letter
with each child indicating that bullying had been a problem lately, reminding the parents of
North Main's no-tolerance policy, and asking them to reinforce the need for appropriate

behavior.  (*See* Frasca Decl. Ex. 5.)  Kravatz responded by letter the same day, and Plaintiffs,

although they do not describe the content of Kravatz's response in the Amended Complaint, state

that it was ineffectual and inaccurate.  (Am. Compl. ¶ 35.)

On January 27, 2010, S.C. sent an e-mail to Kravatz seeking clarification on how

MWCSD was going to protect M.R. from bullying and aggressive behavior, and including

suggestions of possible solutions to the ongoing bullying.  (*Id.* ¶ 36; *see* Frasca Decl. Ex. 5.)

S.C. also included her thoughts on who was responsible for the bullying and aggression and

stated that Kravatz was "wrong on the facts and the serious harm and ongoing risk of harm to

M.R."  (Am. Compl. ¶ 36.)  In this e-mail, S.C. emphasized that M.R. has been subjected to

"bullying," not merely "teasing."   (*See* Frasca Decl. Ex. 5.)  Second, she recounted that M.R.

had been bullied off and on for about four months, and said that the "culture and climate of

North Main was part of the problem, and that there is plenty of room for community building."

(*Id.*)  Third, she inquired about the specific program North Main had in place to prevent bullying.

(*Id.*)  She acknowledged that there were regular discussions between staff and administration

about bullying, that budgetary constraints were an issue, and that training and education could

not prevent all bullying, but pointed out that some programs have been shown to reduce the

incidence and severity of bullying.  (*Id.*)  Finally, she summarized four additional measures that

would be taken, as she understood from the January 25th meeting:  Petroccito would speak with

another staff member (who appears to have been working with M.R. on his speech) to insure that

M.R. was hearing consistent messages and that M.R.'s time was maximized in speech to improve

his assertiveness skills; Petroccito would check in with M.R. regularly; Petroccito would assess

whether a meeting between M.R., B.S., and V.A. would be productive; and Glick and Petroccito

would work together in morning meetings with the class to address bullying and teach skills to

reduce relational aggression and build a stronger community.  (*Id.*)  In this letter, S.C. told Kravatz that "[d]espite our disagreements and my disappointment with results thus far, it's clear to me that you have the best intentions."  (*Id.*)

On February 2, 2010, S.C. sent Kravatz a letter with detailed information concerning the prevention of bullying, including analysis of studies and resources on anti-bullying programs. (*Id.* ¶ 37.)  Plaintiff also noted that the practices followed by North Main were deemed harmful by experts and the literature.  (*Id.*)

February 3, 2010 was M.R.'s last day at North Main.  (*Id.* ¶ 38.)  His parents removed him as a result of the bullying and placed him at a private Catholic school, Sacred Heart, at which M.R. started on February 8, 2010.  (*Id.* ¶ 39.)  By e-mail that day, S.C. notified Kravatz of M.R.'s removal due to the bullying M.R. experienced at North Main.  (*Id.*)  During the week of February 8, H.R. and S.C. had a meeting with Kravatz and Terlecky in which M.R.'s parents again explained the reasons for M.R.'s transfer to Sacred Heart and that they were still willing to work with Defendants to make needed changes so that North Main would be a safe school.  (*Id.* ¶ 40.)

On February 19, 2010, S.C. met with Kravatz and Defendants DiLorenzo and Mehrhof concerning their ongoing effort to have MWCSD adopt and execute effective anti-bullying policy and procedures.  (*Id.* ¶ 41.)  At this meeting, DiLorenzo stated that the school year was winding down and that the earliest new practices, policies, procedures, and training could be addressed would be in August 2010, "too late for any concrete effect for the start of the 2010-2011 school year."  (*Id.* ¶ 42.)  Plaintiffs interpreted this response as dismissive and ignorant of the importance of having a plan to make the students at North Main safe.  (*Id.*)  Kravatz wrote to M.R.'s parents on March 12, 2010, but did not state what new measures would be taken to

protect M.R. or other students from bullying, and "instead only committed, very vaguely, to further work on the issue with a continued reliance on the failed practices, policies and procedures." (*Id*. ¶ 43.) Based on this response, M.R.'s parents concluded that the bullying of M.R. at North Main would not stop, and that until it did, M.R. would not return. (*Id*. ¶ 44.)

### B. Procedural Posture

On March 10, 2011, S.C. and H.R., individually and as parents of M.R., sued Defendants, alleging hostile educational environment, violations of substantive and procedural due process, violation of the New York Human Rights Law, intentional infliction of emotional distress, negligent supervision, negligence *per se*, and assault. (*See* Doc. 1.) By letter dated May 9, 2011, Defendants sought a pre-motion conference, outlining its reasons for seeking to move to dismiss the Complaint. (Doc. 5.) The issues were discussed at a conference before this Court on July 15, 2011, and Plaintiffs were permitted to amend the Complaint to address the issues to the extent they could. (*See* Minute Entry July 15, 2011.) On August 12, 2011, S.C. and H.R. filed the Amended Complaint alleging, against all Defendants, "Denial of a Property Right in Public Education Pursuant to 42 U.S.C. § 1983 and the Substantive Due Process Clause of the Fourteenth Amendment"[6] and negligent supervision, and against MWCSD, MWCSD Board of Education ("MWCSD BOE"), DiLorenzo, and Kravatz, intentional infliction of emotional

---

[6]       I interpret the Amended Complaint as abandoning the procedural due process claim given the explicit reference to it in the original Complaint and this heading, which does not mention procedural due process. The paragraphs following this heading likewise do not refer to any procedural protections of which Plaintiffs claim to have been deprived, but rather advert only to the "conscience shocking" standard for substantive due process claims. (Am. Compl. ¶ 60.) The parties' briefs seem to assume that the Amended Complaint claims a violation of procedural due process, however, and thus in an excess of caution I address the merits of such a claim even though Plaintiffs have failed to plead it.

distress, and negligence *per se*.  (Am. Compl. 12-16.)  Defendants have moved to dismiss all claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (*See* Ds' Mem.)[7]

**II.**    **Discussion**

   **A.  Standard of Review**

   "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

   In considering whether a complaint states a claim upon which relief can be granted, the court may "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determine whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.  Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*

---

[7]     "Ds' Mem." refers to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss. (Doc. 13.)

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'"  *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### B.  Due Process – Deprivation of a Property Interest

"To state a due process violation – procedural or substantive – Plaintiff[s] must first show a deprivation of a constitutionally protected property or liberty interest."  *Perez*, 2012 WL 1943943, at *8 (internal quotation marks omitted); *see White Plains Towing Corp. v. Patterson*, 991 F.2d 1049, 1061-62 (2d Cir. 1993) ("In order to succeed on a claim of deprivation of procedural due process, a plaintiff must establish that state action deprived him of a protected property or liberty interest."); *JG & PG ex rel. JG III v. Card*, No. 08-CV-5668, 2009 WL 2986640, at *5 (S.D.N.Y. Sept. 17, 2009) ("To state a substantive due process claim, a plaintiff must allege that (1) the complained-of state action compromised a constitutionally-protected liberty or property right, and (2) the state action that deprived him of that interest was oppressive or arbitrary.").  Moreover, to demonstrate a deprivation, Plaintiffs must plausibly allege that Defendants "acted with more than mere negligence."  *Grune v. Rodriguez*, 176 F.3d 27, 33 (2d Cir. 1999) (citing *Daniels v. Williams*, 474 U.S. 327, 328 (1986)); *see Williams v. King*, 796 F. Supp. 737, 742 (E.D.N.Y. 1992) ("[A] 'mere lack of due care' by a state official is not cognizable as a 'deprivation' under the Fourteenth Amendment.") (quoting *Daniels*, 474 U.S. at 330-31.  If these threshold requirements are satisfied, a court may then decide whether the deprivation of a protected interest is a violation of substantive or procedural due process.  *See, e.g.*, *Toussie v. Cnty. of Suffolk*, 806 F. Supp. 2d 558, 579 (E.D.N.Y. 2011).  Thus, I first address whether M.R. has a constitutionally protected property interest in a public education and whether Defendants' actions deprived M.R. of that interest.

1.  Property Interest in a Public Education

Plaintiffs may establish a property interest protected by the Fourteenth amendment where they demonstrate a "'legitimate claim of entitlement to the benefits in question.'" *Frooks v. Town of Cortlandt*, 997 F. Supp. 438, 449 (S.D.N.Y. 1998) (quoting *Crowley v. Courville*, 76 F.3d 47, 52 (2d Cir. 1996)) (substantive due process); *see White Plains Towing*, 991 F.2d at 1062 (procedural due process). The Second Circuit has found that Article 11, Section 1 of the New York Constitution[8] "does not appear . . . alone [to] give[] rise" to a legitimate claim of entitlement to a public education, but that New York Education Law Section 3202(1)[9] does so for children of M.R.'s age, *see Handberry v. Thompson*, 446 F.3d 335, 353 (2d Cir. 2006); *see also Saggio v. Sprady*, 475 F. Supp. 2d 203, 210 (E.D.N.Y. 2007) (New York Education Law Section 3202(1) establishes a right to public education), and thus M.R. has a property interest in a public education protected by the Fourteenth Amendment.

2.  Deprivation of M.R.'s Property Interest

Defendants' actions, however, did not deprive M.R. of this property interest, which "entitle[s him] to attend the public schools maintained in the district in which [he] resides." N.Y.

---

[8]     "The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." N.Y. Const. art. 11, § 1.

[9]     "A person over five and under twenty-one years of age who has not received a high school diploma is entitled to attend the public schools maintained in the district in which such person resides without the payment of tuition." N.Y. Educ. Law § 3202(1). Plaintiffs cite to New York Education Law § 10, part of the recently enacted Dignity for All Students Act, N.Y. Educ. Law §§ 10-18, the purpose of which is "to afford all students in public schools an environment free of discrimination and harassment," *id.* § 10; *see id.* §§ 12-14 (prohibiting harassment and discrimination, setting forth policies and guidelines to be implemented, and listing the Commissioner of Education's responsibilities in implementing such policies). But this law took effect on July 1, 2012, so whatever its effect on the contours of a property interest in a public education in New York after that date, it does not affect this case, which arose and was filed in this Court before that date. I have found no law, either explicitly or by necessary implication, directing me to apply this law retroactively. *See Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) ("Statutes are disfavored as retroactive when their application would . . . impose new duties with respect to transactions already completed.") (internal quotation marks omitted); *id.* ("[I]t has become a rule of general application that a statute shall not be given retroactive effect unless such construction is required by explicit language or by necessary implication.") (internal quotation marks omitted). In any event, as discussed below, even if this law established a property right to a public education free from harassment, Plaintiffs' due process claims fail for other reasons.

-12-

Educ. Law § 3202(1).  Defendants did not suspend M.R. from North Main or prevent him from attending another school within MWCSD; M.R.'s parents removed him from North Main and placed him in a private school.  *See Saggio*, 475 F. Supp. 2d at 210 ("[T]he District did not exclude her from attending school.  It thus cannot be said that the District infringed upon her right to an education."); *cf. Goss v. Lopez*, 419 U.S. 565, 573-74 (1975) (where Ohio law created property interest in public education, expulsion or suspension for misconduct without fair procedures to determine whether misconduct occurred constitutes deprivation without due process); *Takeall ex rel. Rubinstein v. Ambach*, 609 F. Supp. 81, 86 (S.D.N.Y. 1985) (refusal to admit plaintiff to schools in Defendant school district constituted deprivation of property interest).

Plaintiffs' contentions that M.R. was forced to withdraw from MWCSD and that MWCSD constructively expelled M.R., (*see* Ps' Mem. 12),[10] are meritless.  Plaintiffs have not plausibly alleged or even suggested that it was not feasible for M.R. to have received a public education at another school within MWCSD.  *See Saggio*, 475 F. Supp. 2d at 210 (coercion argument unavailing because no evidence suggesting plaintiff was forced to choose home-schooling over transferring).  All of S.C.'s criticisms are leveled at North Main.  (*See, e.g.*, Frasca Decl. Ex. 5 (culture at North Main part of the problem).)  I do not mean to suggest that Plaintiffs must try to place M.R. in each of the schools within the MWCSD,[11] but the Amended Complaint is devoid of any suggestion that M.R. would not have had a better experience at any other MCWSD elementary school.

---

[10]  "Ps' Mem." refers to Plaintiffs' Memorandum In Opposition to Defendants' Motion to Dismiss.  (Doc. 15.)

[11]  I take judicial notice of the fact that there are four other elementary schools within MWCSD, all relatively close to North Main.  *See* http://www.mw.k12.ny.us/schools.cfm (last visited July 12, 2012).

Moreover, I find that Plaintiffs, in spite of their conclusion that Defendants acted with deliberate indifference, (*see, e.g.*, Am. Compl. ¶ 21), have not alleged facts that plausibly suggest anything more than mere negligence, which cannot give rise to a deprivation of a property interest. *See Grune*, 176 F.3d at 33.  Defendants took some action in response to the bullying of M.R., such as the recess monitor and Petroccito's work with M.R. on his assertiveness, with both of which S.C. was initially satisfied, but which were ultimately not effective in stopping the bullying over the course of about three months from early November 2009 to M.R.'s removal from North Main in early February 2010.[12]  That Defendants believed that new anti-bullying training and practices could not be implemented until August 2010, after the end of the current school year, (*see* Am. Compl. ¶ 42), may have been incorrect or misguided, but is at most plausibly negligent.

For these reasons, Defendants did not deprive M.R. of his property interest in a public education, and thus Plaintiffs' substantive and procedural due process claims fail as a matter of law.  But even if Defendants' actions did amount to a deprivation, I find other defects in Plaintiffs' substantive and procedural due process claims, which I now address separately.

### C.  Substantive Due Process

"To state a substantive due process claim, a plaintiff must allege that . . . the state action that deprived him of [a constitutionally protected] interest was oppressive or arbitrary." *Card*, 2009 WL 2986640, at *5.  Conduct that is deemed to be "arbitrary or oppressive" must "shock the conscience." *West v. Whitehead*, No. 04-CV-9283, 2008 WL 4201130, at *13 (S.D.N.Y. Sept. 11, 2008).  "While the measure of what is conscience shocking is no calibrated yard stick,"

---

[12]    It is unclear what measures Glick took after S.C. contacted her in early November 2009 before S.C. involved Kravatz in December 2009.  In any event, Plaintiffs do not allege any deliberate indifference on the part of Glick, nor do they name her in this lawsuit, so I assume that there was no wrongdoing on her part during that period.

*Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998), "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level," *id.* at 849. As the Second Circuit has stated,

> Substantive due process is an outer limit on the legitimacy of governmental action. It does not forbid governmental actions that might fairly be deemed arbitrary or capricious and for that reason correctable in a state court lawsuit seeking review of administrative action. Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority.

*Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999). Making a bad decision or acting negligently is not the sort of "conscience shocking" behavior that violates the Constitution, s*ee Sacramento*, 523 U.S. at 849, nor necessarily is conduct that violates state law, *see Padberg v. McGrath-McKechnie*, 203 F. Supp. 2d 261, 283 (E.D.N.Y. 2002).

In *Smith v. Guilford Board of Education*, 226 F. App'x 58 (2d Cir. 2007) (summary order),[13] a case on which Defendants rely and Plaintiffs make no attempt to distinguish, the Second Circuit found that "failure to respond to the harassing and bullying to which [the student] was subjected . . . , while highly unfortunate, does not rise to the level of egregious conduct . . . so brutal and offensive to human dignity as to shock the conscience." *Id.* at 62 (third alteration in original) (internal quotation marks omitted). The bullying at issue included, but was not limited to,

> (1) pushing and shoving; (2) blocking [the child's] entrance into or out of classrooms, restraining and imprisoning him therein; (3) placing [the child] on students' shoulders and physically treating him "like a baby;" (4) teasing, harassing, bullying and tormenting [the child] on a daily basis; (5) forcing [the child] into a backpack, zipping the pack, then parading the backpack, with [the child] visible, through the halls of the school; (6) mocking [the child] with sexually suggestive comments; (7) on at least one occasion, picking him up

---

[13]     While the Second Circuit's rulings by summary order do not have precedential effect, *see* Rule 32.1.1(a) of the Local Rules and Internal Operating Procedures of the Court of Appeals for the Second Circuit (effective December 15, 2010), I find *Smith* persuasive and directly on point in this case.

against his will, cradling and treating him as if he were a baby; (8) grabbing, assaulting, restraining, imprisoning, and teasing him with disparaging or threatening comments.

*Smith v. Guilford Bd. of Educ.*, No. 03-CV-1829, 2005 WL 3211449, at *1 (D. Conn. Nov. 30, 2005); *compare Rochin v. California*, 342 U.S. 165, 172-73 (1952) (forced pumping of suspect's stomach to obtain evidence shocked the conscience); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d 246, 249-52 (2d Cir. 2001) (gym teacher violently assaulting eighth grade student shocked the conscience); *Camac v. Long Beach City Sch. Dist.*, No. 09-CV-5309, 2011 WL 3030345, at *4, 14 (E.D.N.Y. July 22, 2011) (false report to police of student's suicide attempt and falsely testifying under oath to same, which resulted in child's commitment at hospital, sufficient to withstand dismissal); *Card*, 2009 WL 2986640, at *2 (denying dismissal where defendants allegedly "locked Plaintiff-Children in closets or bathrooms for extended periods of time," "used physical force to restrain and sometimes force feed Plaintiff-Children, causing vomiting and injury," "engaged in inappropriate sexual conduct in front of Plaintiff-Children," "photographed Plaintiff-Children's private parts," "called [children] degrading names," and "refused to change certain Plaintiff-Children's diapers"), *with Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) ("[s]triking a student without any pedagogical or disciplinary justification," while "undeniably wrong," does not "shock the conscience"); *Chambers v. N. Rockland Cent. Sch. Dist.*, 815 F. Supp. 2d 753, 771 (S.D.N.Y. 2011) (assistant principal's underestimate of severity of harassment of plaintiff-student and accompanying imposition of minimal punishment on harassers who later violently attacked plaintiff-student did not shock conscience); *Myslow v. New Milford Sch. Dist.*, No. 03-CV-496, 2006 WL 473735, at *14 (D. Conn. Feb. 28, 2006) (encouraging parents to medicate student "simply does not rise to the level that can be described as conscience-shocking"); *Cohn v. New Paltz Cent. Sch. Dist.*, 363 F. Supp. 2d 421, 434 (N.D.N.Y. 2005) (school's overbroad

interpretation of behavior code does not shock conscience); *Yap v. Oceanside Union Free Sch. Dist.*, 303 F. Supp. 2d 284, 296–97 (E.D.N.Y. 2004) (teacher's racial slurs did not shock conscience); *Bisignano v. Harrison Cent. Sch. Dist.*, 113 F. Supp. 2d 591, 599-600 (S.D.N.Y. 2000) (teacher confining student to storage closet did not shock conscience).

Here, Defendants' response to M.R.'s bullying did not "transgress[] the outer limit of legitimate governmental action," *Cohn*, 363 F. Supp. 2d at 434 (internal quotation marks omitted), so as to shock the conscience. I need not go as far as the court in *Smith* in finding that a complete failure to respond to the bullying of M.R. is not conscience-shocking. *See Smith*, 226 F. App'x at 61 (defendants allegedly knew of some or all of the mistreatment to which plaintiff was subjected, and yet "condoned, permitted and/or acquiesced in" such mistreatment) (internal quotation marks omitted). Defendants here at least took some steps to address M.R.'s situation, including the use of a recess monitor and counseling M.R. on his assertiveness and communication skills. That these measures failed to stop the bullying may give rise to a state-law negligence claim – I express no view on the subject – but not to a substantive due process violation. *See Musco Propane, LLP v. Town of Wolcott*, No. 10-CV-1400, 2011 WL 3267756, at *5 (D. Conn. July 28, 2011) ("In determining whether a plaintiff has stated a claim for violation of federal substantive due process, the court is mindful that the Fourteenth Amendment is not a 'font of tort law.'") (quoting *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005)).[14] Because Defendants' actions do not shock the conscience, Plaintiffs' substantive due process claim fails

---

[14]     Plaintiffs rely solely on *Johnson v. Newburgh Enlarged School District* in arguing that the conduct in this case shocks the conscience, (*see* Ps' Mem. 13-14), but that case is inapposite. In *Johnson*, the Second Circuit found a teacher's assault of a student to be conscience-shocking. *See Johnson*, 239 F.3d at 249 (gym teacher grabbed student by the throat, lifted him off the ground by the neck, dragged him across the gym floor, choked him, slammed his head into the bleachers four times, rammed his head into a fusebox, and punched him in the face). Here, of course, other students, not a teacher, assaulted M.R., and the level of violence is far different. This case is significantly closer to *Smith* than *Johnson*.

for this additional reason.[15]  *Cf. Chambers*, 815 F. Supp. 2d at 771 (school principal's decision in response to verbal harassment only to hold meeting between student and her harasser did not shock conscience).

### D.  Procedural Due Process

To state a procedural due process claim, if a plaintiff has demonstrated a deprivation of a property interest (a requirement that I find Plaintiffs have not satisfied here), he or she must demonstrate that the deprivation occurred without due process.  *See McMenemy v. City of Rochester*, 241 F.3d 279, 285-86 (2d Cir. 2001).  "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  *Mathews v.*

---

[15]    Plaintiffs argue that North Main's inaction – a characterization that is inaccurate given that the Amended Complaint alleges some action on North Main's part – with respect to the bullying of M.R. gives rise to a substantive due process violation under the "special relationship" or "state-created danger" theories.  (*See* Ps' Mem. 8-10.)  Although generally "'[o]nly an affirmative act can amount to a violation of substantive due process,'" *Chambers*, 815 F. Supp. 2d at 763 (alteration in original) (quoting *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007)), "in exceptional circumstances a governmental entity may have a constitutional obligation to provide . . . protection, either because of a special relationship with an individual, or because the governmental entity itself has created or increased the danger to the individual," *id.* (alteration in original) (quoting *Ying Jing Gan v. City of N.Y.*, 996 F.2d 522, 533 (2d Cir.1993)).  But the special relationship theory "does not apply to the school setting," even where attendance is compulsory.  *Id.* at 764 n.10 (collecting cases).  Plaintiffs rely on *Pagano ex rel. Pagano v. Massapequa Pub. Schs.*, 714 F. Supp. 641 (E.D.N.Y. 1989), (*see* Ps' Mem. 9), in which the court found that plaintiff stated a substantive due process claim based on allegations of seventeen instances of bullying and defendants' failure to take preventative action even though they were aware of the bullying.  *See Pagano*, 714 F. Supp. at 643-44.  In M.R.'s case, some measures – although they proved ineffective – were taken, and thus *Pagano*, which is not binding on me and contrary to the weight of authority in any event, is distinguishable.

Likewise, the state-created danger theory does not impose a duty on Defendants to protect students from assaults by other students, even if Defendants knew or should have known of the danger.  *See Scruggs v. Meriden Bd. of Educ.*, No. 03-CV-2224, 2007 WL 2318851, at *12 (D. Conn. Aug. 10, 2007) (collecting cases).  Defendants would be liable only if they acted affirmatively to put M.R. in danger, such as encouraging the other students to bully M.R.  *Id.*; *see also Matican v. City of N.Y.*, 424 F. Supp. 2d 497, 505 (E.D.N.Y. 2006) ("[T]he state-created danger exception applies only when the governmental actor's conduct can be fairly characterized as 'affirmative,' as opposed to 'passive.'") (quoting *Pena*, 432 F.3d at 109).  As pleaded, Defendants took steps to stop, not encourage, bullying, and thus their actions do not give rise to a substantive due process violation under the state-created danger theory does.  *Cf. Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 430-31 (2d Cir. 2009) (where police officers "openly expressed camaraderie with [domestic abuser] and contempt for [plaintiff-victim]," reasonable factfinder could conclude that officers, by their affirmative conduct, violated plaintiff's due process rights under state-created danger doctrine); *Pena*, 432 F.3d at 110-11 (allegations that defendants stood by and did nothing insufficient to state substantive due process claim; allegations that defendants encouraged misconduct sufficient).

*Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  It is a

> long accepted premise that due process dictates that persons ordinarily deserve some kind of hearing *prior* to the deprivation of a [protected] interest, and that it is only where the state is effectively unable to anticipate and prevent a random deprivation of a [protected] interest, [that] post deprivation remedies might satisfy due process.

*Velez v. Levy*, 401 F.3d 75, 91 (2d Cir. 2005) (emphasis and third alteration in original) (citation and internal quotation marks omitted); *see Hellenic Am. Neighborhood Action Comm. v. City of N.Y.*, 101 F.3d 877, 880 (2d Cir. 1996) (as to random and unauthorized acts, "the Due Process Clause of the Fourteenth Amendment is not violated . . . so long as the State provides a meaningful postdeprivation remedy").   In this case, given that M.R.'s parents unilaterally removed M.R. from North Main, an event Defendants could not have anticipated, no pre-deprivation process was required because only post-deprivation procedural protection was possible.  *See McMenemy*, 241 F.3d at  288-89 (citing *Parratt v. Taylor*, 451 U.S. 527, 538 (1981)).[16]

    The Amended Complaint makes clear that Plaintiffs were heard by Kravatz, DiLorenzo, and Mehrhof twice in person and twice in writing after M.R. was withdrawn from North Main. Plaintiffs have expressed their dissatisfaction with the outcome of their interactions with Defendants, but procedural due process guarantees only a process, not a specific outcome.  *See Zahrey v. City of N.Y.*, No. 98-4546, 2009 WL 1024261, at *6-7 (S.D.N.Y. Apr. 15, 2009) (procedural due process "'is a guarantee of fair procedure'") (citing *Daniels*, 474 U.S. at 337 (Stevens, J., concurring)); *see also Daniels*, 474 U.S. at 337 (Stevens, J., concurring) ("In a procedural due process claim, it is not the deprivation of property or liberty that is

---

[16]    In any event, Plaintiffs do not argue that they were deprived of any pre-deprivation process that they were due.  They were heard on numerous occasions prior to their removal of M.R. from North Main.

unconstitutional; it is the deprivation of property or liberty *without due process of law* – without adequate procedures.") (emphasis in original).  In any event, Plaintiffs do not make clear what process they think they were due.  For instance, they contend that New York Education Law Section 310[17] – which Defendants argue provides adequate post-deprivation process, (*see* Ds' Mem. 11-12) – "does not provide an administrative remedy for regular education students who are victims of bullying," and that they have "fully availed themselves of any and all of MWCSD's avenues for reporting incidents and grievances."  (Ps' Mem. 15-16.)  Plaintiffs appear to suggest – without legal support – that they were deprived of due process because Defendants "never informed [them] that they should file an Appeal with the BOE and then with the Commissioner [of] Education," yet simultaneously they contend – without factual support – that taking such actions would be futile.  (*See id.* at 16.)[18]

Plaintiffs' contention that procedural due process required Defendants to provide Plaintiffs with notice of their opportunity to appeal is incorrect.  *See Walsh v. Suffolk Cnty. Police Dep't*, No. 06-CV-2237, 2008 WL 1991118, *14 n.13 (E.D.N.Y. May 5, 2008) (no obligation to provide notice of availability of Article 78 proceeding); *Vialez*, 783 F. Supp. at 121 ("New York does provide an adequate avenue for appeal of a Housing Authority decision, and

---

[17]    "Any party conceiving himself aggrieved may appeal by petition to the commissioner of education who is hereby authorized and required to examine and decide the same; and the commissioner of education may also institute such proceedings as are authorized under" Article 7 of the New York Education Law, titled "Commissioner of Education."  N.Y. Educ. Law § 310.

[18]    The parties often erroneously conflate the procedural due process analysis with the rule that "[o]rdinarily, plaintiffs pursuing civil rights claims under 42 U.S.C. § 1983 need not exhaust administrative remedies before filing suit in court."  *Porter v. Nussle*, 534 U.S. 516, 523 (2002).  (*See* Ds' Mem. 12; Ps' Mem. 15-16.)  The availability of adequate process defeats a procedural due process claim; Plaintiffs' failure to avail themselves of any particular administrative process is not relevant.  *See McMenemy*, 241 F.3d at 289; *Vialez v. N.Y.C. Hous. Auth.*, 783 F. Supp. 109, 113-14 (S.D.N.Y. 1991) ("Although one need not exhaust state remedies before bringing a § 1983 action claiming a violation of due process, one must nevertheless show that state procedural remedies are inadequate.") (internal citation omitted).  In other words, the existence of state remedies is relevant not because Plaintiffs must exhaust them before bringing a Section 1983 case, but because if those remedies are adequate, there is no deprivation of procedural due process.  Thus, I disregard the parties' arguments regarding exhaustion and futility and instead focus on the availability of adequate process.

due process does not require that plaintiff have been sent notice of that opportunity to appeal."). Moreover, such an appeal may have been unsuccessful, but it would not have been futile in the sense that the Commissioner would have been without jurisdiction to hear it.  New York Education Law Section 310 – which provides that an aggrieved party may appeal to the commissioner of education "any . . . official act or decision of any officer, school authorities, or meetings concerning any other matter under [the New York Education Law], or any other act pertaining to common schools," N.Y. Educ. Law § 310(7) –  provides the commissioner with "broad discretion" to review a "wide range of actions."  *Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ.*, 466 F.3d 232, 248 (2d Cir. 2006); *see also Donohue v. Copiague Union Free Sch. Dist.*, 47 N.Y.2d 440 (1979) (in dismissing a claim of "educational malpractice," citing, under New York Education Law § 310(7), "the right of students presently enrolled in public schools, and their parents, to take advantage of the administrative processes provided by statute to enlist the aid of the Commissioner of Education in ensuring that such students receive a proper education").  Defendants have submitted a number of public decisions of appeals to the Commissioner – which Plaintiffs do not address – that confirm that schools' responses to bullying and harassment are squarely within the range of actions that the Commissioner reviews, (s*ee* Ds' Mem. 11-12), which I find to be adequate process in this case.  *See Schwartz v. Schuker*, 298 F. Supp. 238, 241 (E.D.N.Y. 1969) (availability of appeal of suspension under Section 310, whereby a student can appeal any official act of school authorities relating to any matter under the Education Law, satisfies due process).  Additionally, Plaintiffs could institute an Article 78 proceeding to review a decision of the Commissioner.  *See Federico v. Bd. of Educ. of Pub. Schs. of Tarrytowns*, 955 F. Supp. 194, 202 (S.D.N.Y. 1997); *Taylor v. Brentwood Union Free Sch. Dist.*, 908 F. Supp. 1165, 1176 (E.D.N.Y. 1995).  The Article 78 proceeding, itself a sufficient

post-deprivation remedy, *see Manza v. Newhard*, No. 11-CV-2256, 2012 WL 917286, at *2 (2d

Cir. Mar. 20, 2012) (summary order), is also adequate process.

Accordingly, Plaintiffs' procedural due process claim fails for these additional reasons.

### E.  State Law Claims

Because the Court has dismissed all of Plaintiffs' federal causes of action, the Court

declines to exercise supplemental jurisdiction over Plaintiffs' remaining state-law claims.  *See* 28

U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966); *Kolari v. N.Y.-*

*Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006).

### F.  Leave to Amend

Leave to amend should be "freely give[n] . . . when justice so requires."  Fed. R. Civ. P.

15(a)(2); *see Zucker v. Five Towns Coll.*, No. 09-CV-4884, 2010 WL 3310698, at *3 (E.D.N.Y.

Aug. 18, 2010).  It is within the discretion of the district court to grant or deny leave to amend,

*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007), and "[l]eave to amend,

though liberally granted, may properly be denied for:  undue delay, bad faith or dilatory motive

on the part of the movant, repeated failure to cure deficiencies by amendments previously

allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility

of amendment, etc.," *Ruotolo v. City of N.Y.*, 514 F.3d 184, 191 (2d Cir. 2008) (internal

quotation marks omitted).  Furthermore, a district court has no obligation to grant leave to amend

*sua sponte*.  *See Gallop v. Cheney*, 642 F.3d 364, 369 (2d Cir. 2011) ("[N]o court can be said to

have erred in failing to grant a request [to amend the complaint] that was not made.").

I decline to *sua sponte* grant Plaintiffs leave to amend because such amendment would be

futile.  Plaintiffs already had a chance to amend, knowing what Defendants' arguments would

be.  Moreover, Plaintiffs did not ask for leave to amend a second time and have not suggested

that they have facts that would cure the defects in the Amended Complaint identified above.  The

reason for dismissal is substantive, and better pleading would not lead to a different result. *See id.* (district court did not err in dismissing claim with prejudice in absence of any indication plaintiff could or would provide additional allegations leading to different result); *Ariel (UK) Ltd. v. Reuters Grp., PLC*, 277 F. App'x 43, 45-46 (2d Cir. 2008) (summary order) (district court did not exceed its discretion in not *sua sponte* granting leave to amend where plaintiff had already amended complaint once and amendment would have been futile); *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (leave to amend should be denied as futile where problem with complaint is substantive and better pleading would not cure it); *Payne v. Malemathew*, No. 09-CV-1634, 2011 WL 3043920, at *5 (S.D.N.Y. July 22, 2011) ("That Plaintiff was provided notice of his pleading deficiencies and the opportunity to cure them is sufficient ground to deny leave to amend *sua sponte*."); *cf. Gallop*, 642 F.3d at 369 (no abuse of discretion in not permitting amendment that was never requested).

## III.   Conclusion

The Court is sympathetic to M.R.'s plight and can understand why his parents felt it best to remove him from North Main. The Court also understands why M.R.'s parents may feel entitled to legal redress. But Defendants' actions are plausibly at most negligent and do not give rise to federal constitutional claims. Accordingly, any such redress, if warranted, must be sought in state court.

For the reasons above, Defendants' motion to dismiss is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 11), and close the case.

**SO ORDERED.**

Dated: July _18_, 2012
        White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.

-23-